Filed 6/7/22  P. v. Sengphachanh CA4/1
Opinion following rehearing

OPINION ON REHEARING

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077702 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD278835) |
| STEVE SENGPHACHANH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed as modified.

Johanna Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Steve Sengphachanh of a lewd act on Jane Doe,[1] the 12-year-old daughter of his best friend, and found true the allegation he had "substantial sexual conduct" with Jane, making him ineligible for probation. (Pen. Code,[2] §§ 288, subd. (a), 1203.066, subd. (a)(8).) The jury deadlocked on the charge that Sengphachanh committed aggravated sexual assault of Jane. (§ 269, subd. (a).) The trial court declared a mistrial as to that charge and later dismissed it on the People's motion. The court sentenced Sengphachanh to the upper term of eight years in state prison and imposed various fines and fees.

On appeal, Sengphachanh asserts several errors deprived him of his constitutional right to a fair trial and mandate reversal of his conviction. First, he asserts the trial court erred in failing to sua sponte instruct the jury on the limited purpose of an expert's testimony regarding general myths and misconceptions of child sexual abuse and delayed disclosure, or alternatively, his trial counsel was ineffective for failing to request such a limiting instruction. Second, he asserts the court erred by failing to sua sponte include optional language in the pattern instruction on witness credibility that the jury may consider a witness's admission of prior untruthfulness as a factor in evaluating a witness's testimony. Third, Sengphachanh asserts his trial counsel rendered ineffective assistance of counsel when he failed to object under Evidence Code section 352 to the prosecution's motion to admit evidence of a prior incident of sexual misconduct against Jane pursuant to

---

[1] Pursuant to rule 8.90(b)(4) of the California Rules of Court, we use an anonymous first name and surname to protect the victim's identity.

[2] All further undesignated statutory references are to the Penal Code.

Evidence Code section 1108. As to these claims, we conclude there was no prejudicial error in the trial court's instructions to the jury and trial counsel did not render ineffective assistance of counsel.

Sengphachanh further asserts the matter should be remanded for resentencing for two reasons: He was prejudiced by the trial court's denial of his request to be physically present in the courtroom at his sentencing hearing. The trial court erred by imposing fines and fees without determining his ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). He further asks us to vacate any unpaid portion of the $154 criminal justice administration fee imposed under the recently repealed Government Code section 29550.1. We shall modify the judgment to vacate any unpaid portion of that fee as of July 1, 2021.

After we initially filed this opinion on March 29, 2022, wherein we affirmed the judgment in all other respects, Sengphachanh filed a petition for rehearing asking this court to consider an inadvertently omitted issue: Whether he is entitled to be resentenced under Senate Bill No. 567 (Senate Bill 567) (Stats. 2021, ch. 731, § 1.3), which was enacted while the appeal was pending and amended section 1170, subdivision (b), effective January 1, 2022, to limit the situations under which an upper term could be imposed. The Attorney General conceded we should grant the rehearing petition and remand the matter to the trial court for resentencing under the new law. We accepted the Attorney General's concession as proper, granted the rehearing petition, and we now remand the matter to the trial court for resentencing. We affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Evidence at Trial*

A.    *Prosecution's Case*

The prosecution called Jane, who was then 14 years old, her parents Grace and Earl, the lead investigator, the social worker who forensically interviewed Jane, and the child abuse pediatrician who medically examined Jane to testify at trial.[3] We summarize the trial evidence and relevant facts below.

1.    *The Sexual Assault on January 15, 2018*

Jane's mother, Grace, married Earl when Jane was six years old. Grace and Earl had two more children together. Earl then adopted Jane when she was 12, in September 2017.

Earl and Sengphachanh were "best friends." They served in the Navy together and had known each other for 16 years. Earl and Grace considered Sengphachanh like a brother. He had served as best man at their wedding. Jane and her younger siblings also considered Sengphachanh, whom they called "Uncle Steve," as family. Jane and her family spent "a lot of time together" with Sengphachanh and his family, "frequently" spending nights and weekends at Sengphachanh's house. The two families also vacationed and celebrated holidays together, including Thanksgivings and Christmases.

---

[3]    The People also called an expert witness to testify about the general myths and misconceptions regarding child sexual abuse and delayed disclosure. We summarize the expert's testimony in our discussion of Sengphachanh's claim of instructional error related to the expert's testimony, at Discussion, Section I.A., *post*.

Before January 2018,[4] Jane was "really close" with Sengphachanh. They were "affectionate" with one another, often "hugged" and "cuddled" while watching television together. Jane found him "fun to be around" and liked spending time with him at his house. On the day Earl adopted Jane, Sengphachanh was there for Jane because "he was like a family member" to her.

Sengphachanh lived with his wife, MaryBianca, and their toddler son, C.S. When Jane slept over at Sengphachanh's house, her parents would typically be there. Grace and Earl and Jane's younger siblings would usually sleep downstairs, and Jane would sleep by herself in C.S.'s room upstairs. Jane's "normal routine" on arriving at Sengphachanh's house was to give him a hug and then go upstairs to C.S.'s room to watch Netflix.

On January 14, Jane slept over at Sengphachanh's house without her parents for the first time. Grace and Earl had to work early the next day and asked Sengphachanh to babysit their children. Grace dropped the children off at Sengphachanh's house in the evening and planned to pick them up the next day around 5:00 or 6:00 p.m. MaryBianca was away on military duty that weekend, but her friend, Dashara, was at the house with her baby. Jane had met Dashara a few times before.

After eating dinner, Jane went upstairs to C.S.'s room to watch Netflix, as she "normally" would. She had been in the room by herself for hours when her younger siblings and C.S. joined her. Jane was on the big bed in the room, while her siblings and C.S. were together on the floor. At some point, the three younger children fell asleep on the floor.

---

4    All further undated references are to 2018.

Jane was laying on the bed on her stomach with her chin resting on a pillow. She was stretched out diagonally with her head at the foot of the bed. She fell asleep with the television on. She was wearing one of Earl's t-shirts and a pair of underwear, and was uncovered.

Jane woke up in the middle of the night with a blanket over her head. It covered her entire face but not any other part of her body. She realized her body position had "changed." She was now on her back and in a "more horizontal" position. Her underwear was "off" and "on [her] ankle." And she "was in pain." The pain was coming from her "private" area "between [her] legs." Sengphachanh was "on top" of her with his penis inside her vagina and he was "moving back and forth." Jane knew it was Sengphachanh because "[h]e was the only male in the house."

Jane "didn't do anything" to resist because she was "really shocked," "paralyzed," and "[s]cared." She did not try to "fight back" or say anything to Sengphachanh. She had not "moved at all" because she was "too scared."

When Sengphachanh "finished," he pulled her underwear back up, left the room and closed the door. When she believed he was gone, Jane "quietly got up," grabbed her phone and texted Grace, "Mom I want to go home first thing in the morning pl[ea]s[e]."[5] It was 1:58 a.m. when Jane sent the text to her mom. Jane then crawled in between C.S. and her little brother on the floor, where she "felt safer," and fell asleep waiting for a response from her mother. She did not tell her mother in the text message what had happened because she was "scared to tell." She explained: "I knew my parents and

_____

[5] On January 5 and January 20, 2022, we directed the clerk of the superior court to transmit to this court certain trial exhibits not included in the appellate record, including the various text messages introduced at trial. We have reviewed these additional trial exhibits in deciding this appeal.

6

[Sengphachanh] was really close. I didn't think they would believe me. Either they would call me a liar or, . . . they would disgrace me or something."

The next morning, Jane went downstairs and sat on the couch and watched television with Dashara and her baby. She did not say anything to Dashara since she did not know or trust her. Jane went to the bathroom and noticed blood on her underwear. She changed and put the bloody underwear in a plastic bag and threw them away when she got home. Jane testified she was not on her menstrual period at the time.

Sengphachanh came downstairs and asked Jane if she wanted to go get food and what she wanted to do that day. Jane "said no to every single one of [his] questions because [she] didn't want to spend any time with him." Sengphachanh told her he was going to get a tattoo and left.

Grace was asleep when Jane texted her at 1:58 a.m. She saw her daughter's message at 6:47 a.m. and immediately texted Jane: "What happened[?] Call me back." Grace did not receive a response from Jane and she texted again at 9:44 a.m.: "What are you doing[?] [Jane] is everything ok[?]" Grace's immediate thought when she saw Jane's text was, "oh, my gosh, what happened?" It was "very unusual" for Jane to text her in "the middle of the night saying she wants to go home."

Graced picked up the children from Sengphachanh's home later that day. She noticed "nothing unusual" about Jane's behavior at the time. Jane got in the car and told Grace, "I just want to go home." Graced asked her "if everything was okay" and Jane again replied, "I just want to go home."

2.    *Jane's Disclosure to Her Parents on March 12*

Jane did not tell her parents what had happened right away because she was scared. She thought her parents would "judge" her and they would

7

not believe her because "[t]hey had a really close relationship" with Sengphachanh.

Over the next two months, Jane's family went to Sengphachanh's house "a couple times to have dinner." Both Grace and Earl noticed that Jane was not "acting like herself." She no longer wanted to give Sengphachanh hugs. She did not run upstairs to watch Netflix. Instead, she "was sticking to [Grace] like glue" and was "clingy."

Jane's family went to Sengphachanh's house again in March. Jane told Grace and Earl she did not want to go but her parents made her go. At Sengphachanh's house, Jane again "stayed really close" to her mother because she "felt protected" by her. Before the sexual assault, Jane "didn't care" if she was with her parents and would normally go upstairs by herself. Grace asked Jane why she "wasn't hugging Steve anymore" and Jane told her, "because I don't want to." Jane was attached to Grace "like glue," and instead of going upstairs, Jane "follow[ed]" Grace everywhere. Grace questioned Jane several times about her "unusual" behavior but Jane would tell her, "I'm fine." So Grace "didn't question her" further.

While eating dinner on March 12, Jane asked Grace what the family was going to do for Easter. When Grace told her they were going to Sengphachanh's house, Jane said, "Mom, I don't want to go." Graced asked Jane several times, "What is wrong with you, [Jane]? . . . [Y]ou need to tell me now." Grace explained she had "such a strong reaction" to Jane's refusal to go to Sengphachanh's house for Easter because Jane's voice "sounded so strenuous. It was like she couldn't even swallow her own spit while telling [Grace what happened]." Grace told Jane, "Enough is enough. You need to tell me what is wrong with you right now."

Jane started crying. Grace had "never" seen Jane "cr[y] like that" or "react that way to anything." Grace "reflected back" to the text message Jane had sent her when she slept over at Sengphachanh's house in January and how Jane was "not her normal self at all" the few times they were at Sengphachanh's house after. Grace then confronted Jane: "What happened at Uncle Steve's? What is wrong with you? You have been not yourself. What is going on?" As Jane described it, she had a "mental breakdown" and "couldn't hold it in anymore." Jane was "shaking" and crying, and then told Grace, "He raped me."

Grace did not believe Jane at first and repeatedly asked her, "Are you sure?" Grace wondered whether she had not spent enough time with Jane and "didn't know if [Jane] was saying it to get attention." And "at the same time," Grace thought: "I had known [Sengphachanh] for a very long time. He was the best man of our wedding, . . . I looked at him as a brother figure." Jane could see that her mother was "in disbelief" because she was asking Jane "a lot of questions," including " 'are you serious?' and '[a]re you lying?' " Jane "got mad and she [told Grace], 'See, I was afraid to tell you.' " Despite Grace's repeated questioning, Grace testified that Jane never wavered.

Grace called for Earl to come downstairs. Jane told her father what had happened and now both parents "were questioning her." Earl asked Jane, "[A]re you sure? Are you sure about this?" Jane again told them: "I woke up with his thingy inside of me. I couldn't scream because [the children] were on the floor asleep. I had a blanket over my head." Like Grace, Earl had "difficulty" believing Jane because Sengphachanh was his "best friend" and he "wouldn't think Uncle Steve would do [something like] that." But to Earl, Jane "was stern it happened." Earl had never seen his daughter upset like this.

9

3. *Forensic Interview and Medical Examination of Jane on March 16*

Grace called the police that same night on March 12. After officers made the initial response to Jane's home, Detective Johnson was assigned the lead investigator. He arranged for Jane to be forensically interviewed and medically examined at the Chadwick Center of Rady's Children's Hospital on March 16.

Jane's 40-minute forensic interview at the Chadwick Center was videotaped. The social worker who conducted the interview testified to authenticate the videotape of the interview, which was then played for the jury. Defense counsel declined to cross-examine the social worker.

Jane's statement to the social worker on March 16 was largely consistent with her March 12 disclosure to Grace and Earl and her testimony at trial. She told the social worker she was "raped" by her "dad's best friend," whom she calls Uncle Steve. It was during her first overnight stay at her uncle's house without her parents. Her younger siblings and Sengphachanh's son had fallen asleep on the floor. She was on the bed wearing one of her father's shirts and a pair of panties, and fell asleep watching Netflix without any covers on. She woke up with her "face . . . covered with a blanket" and pain in her "private part." She "felt like . . . his thingy" was "[i]nside [her], moving." She could not say anything and "couldn't move" because she was scared. She waited until he left the room and quickly grabbed her phone to text her mom to pick her up.

Following the forensic interview, a board-certified child abuse pediatrician performed a medical examination of Jane. The pediatrician testified Jane's examination was "normal" but explained "the genital exam of a female patient who is examined non-acutely [i.e., more than 72 hours after the abuse] will be normal 90 to 95 percent of the time."

10

4.       *Pretext Text Messages Between Jane and Sengphachanh*

Detective Johnson met with Jane on March 22 to prepare her to engage Sengphachanh in a "pretext texting conversation."  Jane texted with Sengphachanh on March 23 and March 24.

On March 23, Jane wrote to Sengphachanh:  "I need to talk to you.  Uncle Steve, Uncle Steve, I really need to talk to you."[6]  Sengphachanh responded and they agreed to talk when Jane came home from church.  The text conversation continued the next morning on March 24 and included the following exchanges:

| Jane: | "I am scared, and I haven't told my parents.  I'm not sleeping or eating, and I wake up at night scared.  Also, my private part is hurting me." |
|---|---|
| Sengphachanh: | "Scared of what?  YIY [why is your] private part hurting you?" |
| Jane: | "We need to talk and [¶] . . .[¶] you can't tell my mom or dad." |
| Sengphachanh: | "Talk about what?" |
| Jane: | "Promise me that you won't tell them." |
| Sengphachanh: | "Promise . . . Hello?" |
| Jane: | "We are going to learn about sex in school." |
| Sengphachanh: | "Okay?  And?  We all learned sex in school." |
| Jane: | "And that night when you stuck your thingy in me, and after that night, my private started hurting.  Is that supposed to happen?" |
| Sengphachanh: | "When did I stick my thing in you?  I have never done that to you." |

---

[6]    Where we summarize text messages, we rely on the reporter's transcript of the witness reading the text conversation to the jury.  We have also reviewed the relevant text messages and, as defense counsel noted in his cross-examination of Jane, Jane and Sengphachanh often did not use punctuations in their text messages to each other.

| | |
|---|---|
| Jane: | "Yes, you have that night when I called my mom to pick me up, to come pick me up." |
| Sengphachanh: | "No, I did not call. I was sleeping the whole night." |
| Jane: | "No, you weren't. I woke up with your thingy inside me. You really hurt me." |
| Sengphachanh: | "Are you talking about the last time you spent the night? You fell asleep on my . . . [b]ed. And then you went to sleep with your brother and sister. [Jane], this is very serious. I would never do that to you." |
| Jane: | "I didn't fall asleep on your bed. And you did do that because I was in pain." |
| Sengphachanh: | "I have never touched you or stuck my thing in you. See, this is why your parents say and I say that you [¶] . . .[¶] can't come sleep with me."[7] |
| Jane: | "Yes, you have, and you put a blanket over my face." |
| Sengphachanh: | "[Jane], do you know that if you tell this lie and assumed I did this to you, I can get in very -- in trouble for this because you said that I did something to you. I told you that I would never do anything to you. I love you as you are my own daughter. All I remembered that night was you came into my bed. [¶] . . .[¶] Watched some TV, and fell asleep. After you left, I went and check up on you guys to see if everything was okay. This is pretty serious that you are accusing me of having sex with you. You need to delete these messages because if somebody else sees this, we will both be in trouble." |
| Jane: | "No. That night, mommy brought me, [my siblings and the dog] over and we went upstairs and [¶] . . . [¶] [w]ent in [C.S.'s] room, and we watched Netflix. Then we fell asleep. [The children] were sleeping on the floor and me on the bed. Then I woke up with your thingy inside in my private and a |

---

7    Jane did not recall going into Sengphachanh's room that night but, in the past, she would sometimes sleep with him in his bed after watching television in his room.

12

| | |
|---|---|
| | blanket over my head. And that is why I asked my mom to come pick me up." |
| Sengphachanh: | "[Jane], you are freaking me out right now." |
| Jane: | "You did this on January 15th this year. It was on the night where mom had to work, and my dad was working at the airport. And Ms. Dashara and [her baby] was there in the living room sleeping." |
| Sengphachanh: | "Stop it. I have never touched you. I need to tell your dad. This is something serious." |
| Jane: | "No. You promised me you wouldn't tell him." |
| Sengphachanh: | "How do you know I did this to you? I don't remember this. I can get in a lot of trouble for this. Do you know this?" |
| Jane: | "Well, I have been holding this in for this whole time, Uncle Steve. How do you think I feel? You are someone close to me, and you did this me." |
| Sengphachanh: | "I did not do this to you. This is very illegal and wrong." |
| Jane: | "Don't tell my parents." |
| Sengphachanh: | "Please don't mention this again, please. I just told your dad that your private parts hurts and you need to go get checked. That's it." |
| Jane: | "Okay. What you want me to do because he is going to ask why. Because he asks 50 million questions." |
| Sengphachanh: | "Well, we don't know why your private part hurts." |
| Jane: | "I will let you know what he said." |
| Sengphachanh: | "Okay. I don't understand that. I know you for many years, and all of a sudden this comes up. [¶] . . . [¶] You spent the night with me before and nothing has happened." |
| Jane: | "Uncle Steve, you did this. . . . You did this to me. It was hard for me to come out and tell you this because I couldn't believe it that night. And you're my dad's best friend. And for me to wake up with you on top of me, I was in shock." (Capitalization added as stated in transcript.) |
| Sengphachanh: | "*You were in shock, but you didn't move.*" (Italics added.) |

Jane never told Sengphachanh "about not moving [during the sexual assault] before." Their texting on March 24 was the first conversation they had about what happened in January. And neither Grace nor Earl had spoken with Sengphachanh about the sexual assault before Jane's conversation with Sengphachanh. Under cross-examination, Jane confirmed she did not move during the sexual assault and testified: "I was in shock, but I never told [Sengphachanh] that I didn't move. So how would he know that I didn't move?"

5. *Pretext Text Messages and Call Between Earl and Sengphachanh*

Detective Johnson also had Earl engage Sengphachanh in pretext text messages and phone calls. On March 23, Sengphachanh texted Earl to tell Earl that Jane needed to talk to Sengphachanh "about something" but he did not know what. The next day on March 24, Sengphachanh texted Earl: "Her private parts hurts and she is scared. Schedule an appointment to get her stuff checked. Don't ask her questions knowing you want all infos." Earl wrote back: "I see. Okay. I guess on Monday I'll have her. I'll have to call her doctor. Thanks, bro."

On March 28, Sengphachanh texted Earl and asked, "Well, what happened?" Earl told him "[t]hey took bloodwork" and "[t]hey're going to get back to me . . . next week." Sengphachanh asked if the doctor knew why Jane was in pain and Earl said they did not but "[t]hey are going to schedule some more tests." Sengphachanh responded: "She said she hid some *bloody panties* somewhere. She felt embarrass [*sic*]. [¶] . . . [¶] Don't ask her stuff, bro. She finally coming out and talking about her feelings. [¶] . . . [¶] *She says she hasn't had her period in two months now.* That's not good." (Italics added.) Earl had not discussed "bloody panties" or Jane being "embarrass[ed]" with Sengphachanh.

On April 1, Earl texted Sengphachanh. The two engaged in their usual banter about random topics when Sengphachanh suddenly asked Earl: "Didn't you say that you can trace [Jane's] messages?" Earl responded: "No. I can't trace [Jane's] message. Why you say that? [¶] . . . [¶] Bro, is there something I need to know?" After a long pause, Sengphachanh responded: "I was trying not to tell you, but it's hearts breaking for me and it's serious. Don't mention it to [Jane], but she is accusing me of molesting her. I don't know how and where she gets this from. I'm stressing the fuck out over this. [¶] She said that the last time she spent the night over here, I stuck my thing in her. Why would I do such a thing? She is like a daughter to me. [¶] . . .[¶] So I don't know how to even pursue this. She said I did. I know damn well I didn't. This ain't no April fools either. This is real shit, bro. Like, if it is true, you can put a bullet in my head your damn self." When Earl responded with "I see," Sengphachanh wrote back, "Damn, bro. That's all you have to say?" Earl replied: "I am in shock. My daughter doesn't lie. She hasn't said any[thing] to me or her mother. I haven't anything to say."

The conversation continued with Sengphachanh telling Earl that Jane asked him "to keep it a secret and not tell [Earl]" but he had to because Earl was his "boy." Earl responded, "I need to find out myself what's going on." Sengphachanh suggested that Jane "had sex with somebody" and was "accusing" him. Earl told Sengphachanh he knows Jane "is not having any sex" and asked Sengphachanh, "what happened that night?" Sengphachanh explained that Jane was in his room watching television, he fell asleep, then Jane went into C.S.'s room with the kids, he "woke up to check on them" and then went back to sleep. He said, "That's all I can remember. But her side of the story said I was on top of her and stuck my thing in her." Earl told

Sengphachanh "this is disturbing to read" and he wanted to "meet up" later to talk.

The next day on April 2, Sengphachanh texted Earl, "Get a pregnancy test at the dollar store." Earl told Sengphachanh that he would call him the next day. Sengphachanh responded, "Take her to the doctor, and they will examine her if she got penetrated or not."

On April 3, at the police station with Detective Johnson, Earl placed a pretext telephone call to Sengphachanh. The 24-minute call was recorded. Earl used a ruse and told Sengphachanh the doctor informed him that Jane was pregnant. Sengphachanh responded: "Really?" "What the fuck?" "How the fuck that happens?" Earl said, "Shit, you tell me, bro." Sengphachanh repeated: "She tested positive to be pregnant, 'cause that's blood work, right? [¶] . . .[¶] So she is pregnant."

Sengphachanh then asked, "Well, now what?" Earl implored with Sengphachanh that they had been friends "for a long time" and asked him if he had any recollection of what happened. Sengphachanh replied, "the only thing I can think about is, the only way I could do that is if I'm sleepwalking." He told Earl there were two occasions a long time ago, before he met his wife, where he had been sleepwalking. Once he woke up "outside" and found himself "just look[ing] around." The other time, he was looking through his blinds with his rifle in his hand. Earl asked Sengphachanh if he thought "this could happen" while Sengphachanh was sleepwalking. Sengphachanh replied, "Yeah, sleepwalking. Is that, how, how the hell do I get my dick caught while I'm sleepwalking?" Earl responded he did not know and Sengphachanh responded, "I don't know either. [¶]. . . [¶] But that's a fucking shocker that [Jane] is pregnant, though."

16

Sengphachanh told Earl, "as a father, you have to abort it."  Earl replied he "can stop this right here" but he wanted to know what Sengphachanh remembered.  Sengphachanh said, "the only thing I can think of, . . . if I was sleepwalking and did it."  Sengphachanh told Earl the last time he sleep-walked was "about six months ago" or "sometime last year."

Sengphachanh told Earl he talked to Dashara to see if she remembered what happened that night.  Dashara told Sengphachanh they were not drinking, she was sleeping upstairs and didn't hear anything, and when she saw Jane the next morning, Jane "looked like she was fine."  Earl responded, "Maybe . . . she's in shock."  Sengphachanh replied, "That's what she said, 'cause she said that she was in shock.  *She didn't move.*"  (Italics added.)

Earl suggested he would ask the doctor to do a DNA test and asked Sengphachanh if he thought the baby would be his.  Sengphachanh answered, "I can't tell you, man, 'cause if you, if you say that, if, if I was sleepwalking and did it, then who knows?  'Cause I, I really don't know what to believe anymore."  Earl asked Sengphachanh if he would provide his DNA for testing and "talk with the cops."  Sengphachanh agreed to give a DNA sample but told Earl he did not want to talk to the police " 'cause that's gonna be more investigation[.]"  Sengphachanh told Earl, "the outcome [of any investigation] is gonna be very bad" because the police will "try to find who is the father of this fetus."  Sengphachanh again urged Earl to "abort it" and said, "hopefully, we forgive and forget."

Sengphachanh continued to tell Earl he did not want the police to be involved, and asked:  "Can you let me retire first?  I got three, three years and four months left.  So I can have some fucking type of money to help out my wife and kid."  Earl responded he could not wait that long and have Jane "suffering."  When Earl told Sengphachanh an investigation would exonerate

17

him, Sengphachanh responded, "Yeah. But what, what if it is me?" Earl asked Sengphachanh why he would say that and Sengphachanh responded, "sleepwalking." Sengphachanh said, "I did, if I did sleepwalk, and I did it, then it's possible [the fetus] is mine." He continued, "Blood work shows that she's pregnant, so I obviously, somebody did it." When Earl suggested the investigation "will clear [his] name," Sengphachanh responded: "That's the thing, man, I don't even want to know the outcome. I just want to fucking forgive and forget, bro."

The next day, on April 3, Sengphachanh texted Earl: "I really don't want to talk to the cops, bro." He then told Earl to do the DNA test so they could avoid getting law enforcement involved. Earl responded, "[O]kay. So what if the DNA comes back and it is yours?" Sengphachanh replied, "If it is mine, then why we need an investigation? There is your proof."

B.    *Defense Case*

Sengphachanh denied sexually assaulting Jane. Defense counsel sought to undermine Jane's credibility in cross-examination, suggesting she had various motives to lie about the assault, and impeached her with prior inconsistent statements. Sengphachanh testified in his own defense, and called his wife and several witnesses who testified they did not observe anything unusual about Jane or Sengphachanh during the relevant weekend and to his good character.

1.    *Cross-Examination of Jane*

Jane denied she had any reason to be upset with Sengphachanh on January 14. She initially testified she "might have been grounded" two weeks before January 14. Defense counsel showed her a January 12 text message she sent to her mother stating, "I'm grounded." She confirmed the text message and explained she was grounded at that time because her

18

grades were "really low." As a consequence, her mother "turned off [the] apps" on her mobile phone, which included games, social media, and her camera roll. However, Jane still had her "apps" during the weekend at Sengphachanh's house and explained she had other devices and other things to do "even if [her] mom grounded [her] from [her] phone." Still, Jane acknowledged she was bored at Sengphachanh's house that weekend. Defense counsel asked Jane if she told her mom that Sengphachanh had raped her because she was bored at his house, and "[s]aying . . . he raped me . . . was effective" to avoid returning to his house. Jane answered, "I didn't want to go back [¶] . . . [¶] [b]ecause he raped me."

Jane looked up a video on YouTube on "how to tell my parents that I got raped." She explained she did that in order to talk to other members of her family about the sexual assault, including her grandparents and aunts. The video helped her understand "[t]o stay calm and to tell the truth." She did not recall when she looked for the video, but data retrieved from her phone showed a Google search on March 16 for, "How to Tell Parents . . . About Being Raped." She denied searching for the video in order to prepare for the "official interview" she was to have with the social worker at Chadwick that same day.

Defense counsel asked Jane whether it was true Earl adopted her after her "allegation of being raped." Jane testified, Earl "[a]dopted me before" the assault occurred. He then asked Jane whether she ever "felt kind of left out" and told her mom she "felt like [she wasn't] as loved as much as their [other] two kids were." Jane agreed she had told her mom that.

Defense counsel questioned Jane on her late disclosure of the assault. On redirect, Jane explained the kind of lie she had previously told her parents included telling them she would "stay in the neighborhood" when she

19

did not.  She had never lied about "Uncle Steve" and would never lie "about something like this happening to [her.]"

During her direct examination, Jane testified her friends had talked about "photos of sex or videos of sex" before January.  She "was really curious about what [her friends] were talking about because [she had] never actually heard of it."  Data retrieved from her mobile phone showed she had accessed seven pornography videos on the internet on December 15, 2017, and had opened each video for "no more than 30 seconds."  Jane denied "watch[ing]" the videos and stated she "just scrolled through" them.  At her forensic interview on March 16, the social worker had asked Jane, "Have you ever been shown any pictures or movies of people with no clothes on?"  Jane shook her head "No" in response.  In cross-examination, defense counsel asked Jane whether she was being honest with the social worker or whether she had forgotten about the videos since "people [were] naked in those videos."  Jane testified she had forgotten.

In direct examination, Jane denied that she confused what she saw in the pornography videos with what happened to her in January.  Jane believed the blood on her underwear was an indication to her that "it really happened" and "wasn't a bad dream."  She testified she was not on her menstrual period at the time of the assault, despite texting her mother on January 12, "Mom, I started my period."  Defense counsel questioned Jane on her previous statements regarding the length and timing of her menstrual cycles.  He then asked Jane whether the "reason [she] actually laid on the floor" was so she "wouldn't stain the bed with blood from a period."  She said, "No."

Defense counsel had Jane confirm her statement to the social worker that, other than the January incident, Sengphachanh never touched her

20

anywhere other than "put his arm around [her] in a friendly hug." Jane also confirmed she denied at the preliminary hearing that "anyone" had touched her inappropriately. After confirming these prior statements, defense counsel impeached Jane with a statement she made to the prosecutor "right before trial" that she remembered Sengphachanh touched her breast when they were under a cover together watching television. The prosecution had not introduced this incident in its direct examination of Jane. Jane confirmed the statement, and testified Sengphachanh would touch her right breast over her clothes with one hand while they were both underneath a cover. And it happened "more than once." She explained "[t]he more I thought about it, it came to me." On redirect, she explained she did not feel the touch was wrong or a "bad touch" in that moment. She only cuddled with one person, Sengphachanh, and thought "maybe that is how you cuddle."

2. *Amber M.*

Amber had known Sengphachanh for about four years, they were both in the Navy, and she had gotten to know him well. Amber was Sengphachanh's roommate "[o]n and off" for approximately two years since 2016, and lived in his house in January 2018 but was deployed at the time. Amber knew Sengphachanh to have a reputation of being "very honest, very truthful, [a] great guy."

3. *MaryBianca*

MaryBianca had been married to Sengphachanh for three years and they had, in addition to 5-year old C.S., a 17-day-old newborn at the time of trial. MaryBianca was not home the weekend of January 14. She had been away and returned January 22. When she returned, MaryBianca was cleaning the upstairs bathroom when she found "a bunch of . . . bloody pads" in the trash bin. Sengphachanh told her they belonged to Jane because she

21

was on her period. MaryBianca described Jane as "the black sheep of the family" who kept "to herself a lot." She suggested there was not much of a relationship between Jane and her parents. Jane and Sengphachanh, however, had "more of a father-daughter relationship."

4. *Dashara F.*

Dashara knew Sengphachanh as "Uncle Steve," which she said is what everyone called Sengphachanh. On January 14, Dashara was at Sengphachanh's house for the weekend, with her friend Bria A. and Dashara's two children, who were then about two years old and six months old. Jane and her siblings arrived at the house sometime in the evening. Throughout the evening, Jane was "fine, her normal, typical self" and Dashara saw "nothing out of the ordinary" with her demeanor. During this time, Dashara did not see any interaction or communication between Sengphachanh and Jane.

Everyone went to bed "a little bit after midnight," including the children. Dashara slept in one of the upstairs bedrooms with her baby, while her two year old slept downstairs with Bria. She had her bedroom door "cracked" open and was up "every two hours" to nurse her baby. She heard nothing unusual that night, "[i]t was quiet." Dashara went to the bathroom next door about four times that night and did not see anyone walking around. The room Dashara stayed in does not share a wall with C.S.'s room and at no point did she enter C.S.'s room after the children went to bed.

Dashara woke up the next morning around 6:00 a.m. and went downstairs to make the children breakfast. At some point, Jane came downstairs and started to play with Dashara's baby. Jane was "happy," "cheerful," and "her typical, normal self." Dashara did not see any signs that Jane was in "discomfort or pain as she moved around," and she did not

22

express any discomfort, nor did she say "something bad happened to her that night." Sengphachanh came downstairs, said good morning to everyone, and then left to get his tattoo. Dashara did not see any change in Jane's demeanor.

According to Dashara, Earl came to pick up Jane and her siblings sometime after Sengphachanh left. She was "positive" and had "no doubt" it was Earl, and not Grace, who picked up the children.[8] She had a "good recollection" of that weekend.

Defense counsel then asked Dashara, "Were you on your period [that weekend]?" Dashara testified she was, and that she was able to recall this fact because it was her "normal date" and "[i]t hasn't changed in four years." She testified she left used feminine pads in the upstairs bathroom trashcan. Contrary to Sengphachanh's testimony, Dashara testified she did not have a conversation with him in March 2018 about what happened that weekend. The first time she spoke about the weekend events was with a defense investigator in January 2019.

5.    *Bria A.*

Bria knew Sengphachanh through Dashara and was at Sengphachanh's house the weekend of January 14. On January 14, Jane arrived around 7:00 or 8:00 p.m. and "wasn't in the greatest of . . . moods." Grace "told [Jane] she was put on punishment because of something that happened with her grandparents" and Jane was being "standoffish" and acting like a "preteen." Grace had taken the apps off her phone so "[s]he wasn't really allowed to do much while there." Jane was bored. This was not her typical behavior, "[s]he is usually a little bit more upbeat." Bria was not

---

8    Grace and Jane testified Grace picked up the children on January 15.

"close" to Jane and had only seen her a few times before. Bria went to sleep between 1:00 and 2:00 a.m. on the couch downstairs. Jane and her siblings went upstairs to bed between 1:00 and 2:00 a.m. When she saw Jane the next morning, Jane's demeanor had not "really change[d] from the night before" and she "was still pretty much in the same mood." She did not notice Jane "distressed," "scared," or "nervous," even when Sengphachanh came downstairs.

6. *Sengphachanh*

Sengphachanh denied he sexually assaulted Jane and denied he could have raped her while he was sleepwalking. He explained he "discuss[ed] the idea" of sleepwalking with Earl because he was trying to give Earl "a[n] opinion" or an "option" or a "conclusion" of how it could happen. He explained he felt "compelled to try and reach some conclusion or option" because that is how he is. No matter the situation, he would "try to find a result of everything." Sengphachanh testified he "doubt[s]" or "second-guess[es]" himself a lot and when confronted with the accusation by Jane and Earl, he asked himself, "Did I really do it?"

Sengphachanh explained he "used to sleepwalk a lot" in the past, especially when he was taking Ambien in 2017. When he stopped taking Ambien, the sleepwalking "stopped" or became "minimal." He still sleepwalks but he would always catch himself and not leave his bedroom. Because he would wake up "every time" he sleepwalked, Sengphachanh testified it was not possible he sexually assaulted Jane while sleepwalking. He also knew "deep down" he "would never do that to a human being."

Sengphachanh entered his son's bedroom "[e]arly after midnight" around 1:00 or 2:00 a.m. on January 15 to "check up on" the children. He saw Jane on the bed without a blanket over her, so he grabbed one and "just

24

threw it over her. That was it. [He] went back to bed." He explained he threw the blanket "in the air" and it landed on "[h]er whole body," including covering her face.

Sengphachanh came downstairs around 9:00 or 9:30 a.m. and saw Jane. He told everyone good morning and that he was leaving for his tattoo appointment. Jane was the "[s]ame as always." She "didn't avoid [him] or anything like that."

Sengphachanh explained that his text to Jane—"You were in shock, but you didn't move."—"was just a general question when she said she was shocked." It was "just a question," like, " 'If you were shocked, why didn't you move?' " He explained further that he was trained in the military that "if you're provoked or anything that way, you would defend yourself, scream, have somebody hear for help." And he was "just questioning her shock with [his] shock."

About his statement to Earl to "forgive and forget," Sengphachanh explained he meant forgive "that [Jane] accused [him] of this" and "let's just forget about this and resume our friendship." He was not "asking Earl to forgive and forget that [he] raped [Jane]."

Sengphachanh confirmed Jane was "like a daughter" to him and every time he would see Jane, she was "always smiling" with him. He described her "routine" upon arriving at his house was to "always [go] upstairs" to watch movies in his son's room. He acknowledged there were no "issues in [his] relationship with [Jane]" the weekend of January 14. He confirmed he cannot imagine a reason why Jane would make up the assault.

## II.

### *Verdict and Sentencing*

After deliberating a little over two days, the jury found Sengphachanh guilty of committing a lewd act on Jane (§ 288, subd. (a); count 2) and found true the allegation he had "substantial sexual conduct" with Jane (§ 1203.066, subd. (a)(8)), making him ineligible for probation.

The jury failed to reach a verdict on count 1 that Sengphachanh committed aggravated sexual assault of Jane (§ 269, subd. (a)). A mistrial was declared on count 1—the jury was polled at three votes for guilty and nine votes for not guilty— and it was later dismissed on the People's motion. The trial court sentenced Sengphachanh to the upper term of eight years in state prison on count 2 and imposed various fines and fees.

## DISCUSSION

### I.

### *CALCRIM No. 1193*

The jury heard expert testimony from Anthony Urquiza regarding "common myths or misconceptions" about when and how sexual abuse is disclosed by children. On appeal, Sengphachanh does not challenge the admission of Urquiza's testimony. Rather, he contends the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 1193[9] on the limited

---

9    CALCRIM No. 1193 provides: "You have heard testimony from _____ <*insert name of expert*>regarding child sexual abuse accommodation syndrome. [¶] _____'s <*insert name of expert*> testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged]. [¶] You may consider this evidence only in deciding whether or not _____'s <*insert name of alleged victim of abuse*> conduct was not inconsistent with the conduct of someone

purpose of Urquiza's testimony, or alternatively, his trial counsel was ineffective for failing to request the limiting instruction, and the failure to give such an instruction was prejudicial error. We conclude the absence of CALCRIM No. 1193 was not prejudicial, and because Sengphachanh cannot establish he was prejudiced by counsel's failure to request the limiting instruction, his claim of ineffective assistance of counsel also fails.

A. *Urquiza's Testimony*

Urquiza has been a licensed psychologist for about three decades. He is also a professor in the Department of Pediatrics at the University of California, Davis Medical Center in Sacramento and the director of a child abuse treatment program within the university's Department of Pediatrics. He holds an undergraduate degree in child development, a master's degree in clinical psychology, and a doctorate degree in clinical psychology.

He explained to the jury there are common myths or misconceptions about when and how sexual abuse is disclosed by children.[10] The "most common misperception[ ]" is that children disclose "right away." Instead, there is usually a "significant delay" between the abuse and disclosure, "[t]hat can be easily weeks or months, sometimes even years down the road." Fear is the primary reason for the delayed disclosure. The child may be afraid she will not be believed, someone will think she did something wrong

_____

who has been molested, and in evaluating the believability of (his/her) testimony." (Boldface omitted.)

[10] Urquiza's testimony was not explicitly about child sexual abuse accommodation syndrome (CSAAS), but his opinions were consistent with CSAAS research. (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 389 & fn. 3 (*Bowker*) [first articulated in 1983, CSAAS has five stages—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction].)

or something is wrong with her, she may have been threatened or believe somebody could get hurt. Shame also makes it difficult for children to disclose the abuse.

Most kids are sexually abused by someone with whom they have an existing and ongoing relationship, and whom they may even love. The perpetrator may live in the same household or is close to the child's family. In such an existing relationship of familiarity and trust, the child may not want "a bad thing to happen" to the perpetrator. That causes the child to feel anxiety or ambivalence about what to do when they are sexually abused, particularly where the child does not have a sophisticated understanding about sexual activity.

There are a number of factors that might lead children to disclose sexual abuse, such as a change in the relationship between the child and perpetrator or the child matures and develops a better understanding of the abuse. Children may disclose to their parents if they have confidence they will be protected, but they may fear that disclosure will "break up" the family or the parent will take "strong action" against the perpetrator.

Sexually abused children "[o]ften" will not disclose everything that happened all at once. Instead, they will "test[ ] the waters" by disclosing some information and "assess the response." If they feel supported, believed, and trusted, they begin to disclose more information. A negative response, one that conveys to the child she should not continue to talk about the abuse or doubt about the child's disclosure, "usually shuts down any effort to continue to disclose." Disclosure is not a "singular event" but a process.

Children who are sexually abused do not have a "drive to want to talk about everything that happened." They do not want to recall all of the details. So while victims can accurately describe the acts they experienced,

28

they may have difficulty recalling and describing peripheral details which are not the focus of their attention. Consequently, such peripheral details are not "easily or clearly encoded" in their memory in the first instance. Disclosure of sexual abuse is not usually "a rote verbatim description." A victim may be initially reluctant to talk about everything, even though she remembered the event, or she may remember more with the passage of time, or the victim may disclose more as she feels she is in a safer and more trusted place.

Another misconception is that there is an obvious "tell" of sexual abuse that should be discernible to other people. Urquiza explained there is not. Children "accommodate" or cope with the experience of distress and trauma by "disassociat[ing]," "compartmentalizing," or "suppressing" their feelings. As a result, others may not recognize that the victim is distraught or upset, even when she is around the perpetrator.

Last, Urquiza explained to the jury: "You have not heard from me any opinion about whether a particular child has been abused or not or a particular person is guilty or innocent of a crime for two reasons: I don't know anything about this case. The other one is that is not a place for somebody who is an expert witness. That is the responsibility of a jury." He told the jury he had not read any reports about the case, he did not interview the victim or meet with any individual associated with the case, including the defendant. In cross-examination, he reiterated that he was presenting only "general information" to the jury based on his experience and research, and that he did not know anything "whatsoever" about the case.

B.    *The Absence of CALCRIM No. 1193 Was Harmless Error*

Expert testimony to explain the behavior of child abuse victims, often known as CSAAS evidence, has long been held admissible in California for limited purposes: "[E]xpert testimony on the common reactions of child

29

molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*); see *Bowker, supra*, 203 Cal.App.3d at pp. 389, 392-394.) " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, at p. 1301.)

CALCRIM No. 1193 is the standard limiting instruction that sets forth the permissible uses and limitations of CSAAS evidence. (See fn. 9 *ante*.) Defense counsel did not request the instruction and the trial court did not give it. The court reviewed proposed jury instructions with counsel during a preliminary conference and a final conference after the close of evidence. Both times, the court went through the proposed instructions by "number and title" and told counsel to "speak up" if there was any objection. Both times, defense counsel did not object to the proposed instructions or request additional instructions.

The parties acknowledge there is a split of authority as to whether the trial court has a sua sponte duty to instruct with CALCRIM No. 1193 or a similar limiting instruction when CSAAS evidence is admitted. (Compare *People v. Housley* (1992) 6 Cal.App.4th 947, 959 (*Housley*) [holding that trial courts have a sua sponte duty to provide a limiting instruction "in all cases in which an expert is called to testify regarding CSAAS"] with *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1074 (*Mateo*) [disagreeing with *Housley* and holding a limiting instruction "need only be given if requested"]; see also

30

*People v. Stark* (1989) 213 Cal.App.3d 107, 116 ["*if requested* the jury must be admonished 'that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true" (italics added)]; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 [same]; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587–588 [same].)

Not surprisingly, Sengphachanh urges us to adopt the holding of *Housely* and the Attorney General urges us to reject it and follow *Mateo*. We need not decide whether *Housley* is correctly decided. Based on the record before us, we conclude that even if the court had a sua sponte duty to give CALCRIM No. 1193, the absence of an instruction was harmless error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Mateo, supra,* 243 Cal.App.4th at p. 1074; *Housley, supra,* 6 Cal.App.4th at p. 959.)

In *Housley*, the expert twice told the jury she had not met the victim and had no knowledge of the case, her testimony was presented in general terms, and she described behavior common to abused victims as a class, not to any individual victim. (*Housely, supra,* 6 Cal.App.4th at p. 959.) Under those circumstances, the court concluded "it is unlikely" the jury would have misunderstood or misapplied the expert testimony as proof the victim was in fact sexually abused. (*Ibid.*) Thus, even though the *Housely* court decided the trial court had a sua sponte duty to give a limiting instruction, it had no difficulty in concluding the absence of a limiting instruction "was clearly harmless." (*Ibid.*) The court determined that, "[o]n this record it is not reasonably probable appellant would have received a more favorable verdict if an appropriate limiting instruction had been given." (*Ibid.*)

In *Mateo*, the expert had also not interviewed or evaluated anyone involved in the case, and testified that CSAAS was not intended to predict

31

whether a child had suffered abuse. (*Mateo, supra*, 243 Cal.App.4th at p. 1074.) Thus, the court concluded no prejudice was shown by the failure to instruct pursuant to CALCRIM No. 1193, reasoning that "[w]here, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence." (*Mateo,* at p. 1074.)

Similarly, in this case, even absent a limiting instruction, the jury would not have misunderstood or misapplied Urquiza's testimony as proof that Jane was in fact sexually abused. Like the experts in *Housely* and *Mateo*, Urquiza presented only "general information" to the jury based on his experience and research. He told the jury he did not know anything about the case, he had not read any reports about the case, he had not interviewed the victim or anyone associated with the case. He never expressed an opinion as to whether Jane had been sexually abused or whether she was being truthful. Indeed, Urquiza went to lengths to make explicit to the jury that *that* was not the purpose of his testimony: "*You have not heard from me any opinion about whether a particular child has been abused or not* or a particular person is guilty or innocent of a crime for two reasons: I don't know anything about this case. The other one is that is not a place for somebody who is an expert witness. *That is the responsibility of a jury*." (Italics added.)

Sengphachanh asserts Urquiza "did not specifically testify that his opinion was predicated on the assumption that the abuse occurred," and thus his testimony was different from that of the expert in *Mateo*, who "plainly disclaimed" his testimony was intended to be predictive and "approached the child's behavior from an assumption that the child had been abused." But Sengphachanh overlooks that defense counsel, in cross-examination, prefaced

32

his questions to Urquiza with the statement, "[t]he assumption is there was a rape or assault." Urquiza then made clear, "What I have testified to so far today is research on what happens with kids who have been sexually abused." Together with his earlier, unambiguous statement to the jury that he was not giving "any opinion about whether a particular child has been abused or not," his testimony left no room for interpretation that it was not intended to be predictive.

The prosecutor also clearly explained the limited purpose of Urquiza's testimony to the jury in her closing argument. She emphasized: "Let me be clear about the purpose of [Urquiza's] testimony. He has not met [Jane]. He has never met the defendant. *His testimony is not evidence of guilt.* [¶] But the way that you use it is to consider whether or not [Jane's] conduct, her disclosures, her statements, whether it is consistent with victims of child sexual abuse. [¶] What did we learn about those victims in general? Because there are a lot of myths and misconceptions about who these victims are and how this crime is perpetrated. Kids don't tell. This is not something that happens with, like, immediate disclosures all the time that the moment it happens, she is running to police. That is not how these crimes occur." (Italics added.)

The prosecutor never encouraged the jury to interpret or use Urquiza's testimony in an impermissible manner. Sengphachanh does not contend otherwise. Instead, he argues the prosecution placed "great reliance" on Urquiza's testimony "to support" Jane's credibility and "to explain away her delayed disclosure." But those are the proper uses of the expert's testimony. (See *McAlpin, supra,* 53 Cal.3d at p. 1300 [CSAAS expert testimony admissible to rehabilitate victim's credibility when defendant suggests delayed reporting is inconsistent with her testimony claiming sexual abuse];

33

*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 ["While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse."].) Had the jury been instructed with CALCRIM No. 1193, they would have been told to use Urquiza's testimony in exactly the same manner as argued by the prosecutor. (CALCRIM No. 1193 ["You may consider this evidence . . . in evaluating the believability of [the victim's] testimony." (Boldface omitted.)].)

Here, like in *Mateo,* the trial court also gave CALCRIM No. 332 on expert witness testimony and instructed the jury it was not required to accept the expert's opinion as true or correct, it had to determine the meaning and importance of any opinion, and it could disregard any opinion it found "unbelievable, unreasonable, or unsupported by the evidence." (See *Mateo, supra,* 243 Cal.App.4th at p. 1074.)

Moreover, independent of Urquiza's testimony, the prosecution's case against Sengphachanh was strong. Jane's testimony about the sexual assault was consistent with her initial disclosure to her parents and with her statements to the forensic examiner. She testified she fell asleep on the big bed, wearing a t-shirt and a pair of underwear and was uncovered. The other children were asleep on the floor. She woke up in the middle of the night with a blanket over her head and pain in her vaginal area, and Sengphachanh was "on top" of her with his penis inside her vagina. She did not say anything to Sengphachanh and could not "move[ ] at all" because she was "really shocked" and "too scared." She waited until he "finished" and left the room, and then immediately texted her mother at 1:58 a.m., "Mom I want to go home first thing in the morning pl[ea]s[e]." Despite her parents' initial

disbelief and repeated questioning, Jane never wavered in what she told them and was "stern it happened."

Although the defense attempted to impeach Jane,[11] Jane's description of the assault did not change. Further still, Sengphachanh's own testimony corroborated Jane's description of many of the details surrounding the incident. Sengphachanh testified he entered his son's bedroom around 1:00 or 2:00 a.m. to check up on the children. Jane was asleep on the bed without a blanket, so he grabbed one and threw it "in the air" and it landed on her body and covered her face. Moreover, Jane's abrupt shift in behavior towards Sengphachanh lent further credibility to her testimony of the assault. It was not disputed that, before January 15, Jane and Sengphachanh were "really

---

[11]    The defense urged the jury to find that Jane lied about the sexual assault based on her delayed disclosure and because she had been impeached on a number of matters. It argued Jane's statement that Sengphachanh touched her breast was fabricated because it was impeached by her prior inconsistent statement to the forensic interviewer and preliminary hearing testimony that Sengphachanh had not otherwise touched her inappropriately. The defense also focused a great deal of time attempting to establish that Jane was on her period at the time of the assault, despite her denial, because it believed it to be an "important" and "significant" fact that demonstrated Jane lied about the assault. Defense counsel even acknowledged to the jury that maybe he "overdid it" on this subject. However, Dashara directly contradicted MaryBianca's testimony regarding whose used feminine products were left in the bathroom and severely undermined the defense's contention. Moreover, despite defense counsel's attempt to impeach Jane on what it perceived as inconsistencies in the dates and duration of her cycle, even the child abuse pediatrician explained "periods are pretty hard to predict . . . , especially in a 12-year old girl." Finally, the defense further argued Jane had reason to lie because she was bored at Sengphachanh's house and did not want to go back, and she was the "black sheep" of the family and the rape claim would bring her closer to her parents. The jury was able to assess Jane's credibility and found the defense's attempts at impeaching Jane on these points unconvincing.

close." She loved Sengphachanh and liked spending time with him at his house. But after the assault, she resisted going to Sengphachanh's house, declined to hug him, and, when her parents forced her to go see him, rather than run upstairs to watch Netflix—which even Sengphachanh testified was her "routine" at his house—she clung to her mother "like glue." Sengphachanh himself could not imagine a reason why Jane would make up the assault.

Further corroborating Jane's testimony were—as the prosecutor argued to the jury—the "inside[ ]" details that Sengphachanh inadvertently revealed about the assault in the pretext conversations with Jane and Earl. Jane had never told Sengphachanh she did not move during the assault, yet Sengphachanh told her on March 24, "You were in shock, but you didn't move." In his conversation with Earl on March 28, Sengphachanh told Earl that, "[Jane] said she hid some bloody panties somewhere. She felt embarrass[ed]." But neither Jane nor Earl had told Sengphachanh she had blood on her underwear or that she hid or was embarrassed about "bloody panties." As the prosecutor urged the jury to find, these details evidenced Sengphachanh's "insider knowledge about what happened in that room." Further still, upon being told the ruse that Jane was pregnant, Sengphachanh's explanation that he could have had sexual intercourse with Jane because he was sleepwalking and his repeated appeals to Earl to have Jane "abort" the presumed fetus were strong evidence of his consciousness of guilt.

Sengphachanh contends, however, that prejudice is demonstrated by the jury's inability to reach a verdict on the aggravated sexual assault charge. He deduces from the fact that nine jurors voted to acquit him of count 1 means that nine jurors "necessarily" determined the prosecution had

failed to prove beyond a reasonable doubt that Sengphachanh "even 'slight[ly] penetrated [Jane's] vagina with his penis.' " He reasons that the jury's impasse on count 1, "which swayed heavily in [his] favor, demonstrates that this was a 'close case' that 'turned entirely on [Jane's] credibility.' " In such a close case, and because CSAAS evidence is " 'so potentially damaging,' " he argues there was more than an abstract possibility that one or more jurors may have found him not guilty of the lewd act if they had been instructed with CALCRIM No. 1193.

We are not persuaded. Sengphachanh's speculation about the jury's inability to reach a verdict on a different count does not establish prejudice, and it is based on a questionable assumption. Sengphachanh was charged in count 1 with aggravated sexual assault of a child who is under 14 and at least seven years younger than Sengphachanh, by the act of rape. (§§ 269 subd. (a)(1), 261, subds. (a)(2) and (6).) A conviction on that count required the jury to find Sengphachanh had sexual intercourse with Jane "against [her] will by means of *force, violence, duress, menace, or fear of immediate and unlawful bodily injury*" to her or another person. (§ 261, subd. (a)(2) and (6), italics added; CALCRIM Nos. 1000 and 1123.) The jury was so instructed. Jurors could reasonably have concluded that Jane's testimony did not establish beyond a reasonable doubt that Sengphachanh used force, violence, duress, menace, or fear to accomplish the rape, not that Jane was to be disbelieved or there was no penetration. Sengphachanh's argument also overlooks that the jury found true the allegation that he had "substantial sexual conduct" with Jane in the commission of the lewd act. (§1203.066, subd. (a)(8).) " 'Substantial sexual conduct' means penetration of the vagina" (§ 1203.066, subd. (b)), and although the definition also includes "oral copulation" or

"masturbation" of the victim (*ibid.*), here, there was no evidence that Sengphachanh orally copulated or masturbated Jane.

In sum, we conclude it is unlikely the jury misunderstood or misapplied Urquiza's testimony as proof that Jane was in fact abused, and the other evidence against Sengphachanh was overwhelming proof of his guilt. On this record, we are satisfied that it is not reasonably probable Sengphachanh would have achieved a more favorable result had a limiting instruction like CALCRIM No. 1193 been given.[12] Sengphachanh has failed to establish prejudice.[13]

C.  *Because Sengphachanh Cannot Establish Prejudice, His Ineffective Assistance of Counsel Claim Also Fails*

Sengphachanh alternately asserts his trial counsel was ineffective in failing to request a limiting instruction on Urquiza's testimony. To establish a claim of ineffective assistance of counsel, Sengphachanh must show that

---

[12]  Sengphachanh contends that because of the prosecution's "great reliance" on Urquiza's testimony to support Jane's allegations and credibility, the trial court's failure to give CALCRIM No. 1193 deprived him of "a constitutionally fair trial by lowering the prosecution's burden to prove guilt beyond a reasonable doubt." Since we conclude the jury would not have misunderstood or misapplied Urquiza's testimony as proof that Jane was in fact abused, we reject this contention as well. The jury was properly instructed on the prosecution's burden of proving all elements of the crimes beyond a reasonable doubt.

[13]  Sengphachanh argues the trial court "compounded the prejudice" that resulted from the omission of CALCRIM No. 1193 by instructing the jury, pursuant to CALCRIM No. 303, that "certain evidence was admitted for a limited purpose" and it "may consider that evidence only for that purpose and for no other," without telling the jury it was Urquiza's testimony that was so limited. (Boldface omitted.) We reject this contention since we have concluded no prejudice resulted from the omission of CALCRIM No. 1193.

counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and, as a result, it is reasonably probable that the verdict would have been more favorable to him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–694 (*Strickland*); *People v. Lucas* (1995) 12 Cal.4th 415, 436.) "If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 (*Scott*).)

Because we have concluded the absence of CALCRIM No. 1193 was harmless error, Sengphachanh cannot establish he was prejudiced by counsel's failure to request a limiting instruction, and thus his ineffective assistance of counsel claim also fails. (*Strickland, supra*, 466 U.S. at p. 687; see *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [generally, for purposes of a claim of ineffective assistance of counsel, prejudice must be affirmatively proved].)

Moreover, Sengphachanh cannot establish counsel's performance was deficient because the record sheds no light on why counsel did not request the limiting instruction. (*Scott, supra*, 15 Cal.4th at p. 1212.) And we perceive no basis in the record to conclude counsel's performance was deficient. Sengphachanh argues trial counsel's failure to request CALCRIM No. 1193 cannot be justified as a reasonable tactical decision, because counsel understood "how deeply damaging CSAAS expert testimony can be." He argues counsel subjected Urquiza to a foundational hearing under Evidence Code section 402 to determine his qualifications and the limits of his proposed testimony before it was presented to the jury, and he sought to elicit the expert's testimony on false allegations of abuse, all of which showed

39

counsel's concern with the expert testimony.  But "[a]s a tactical matter, competent counsel could rationally conclude that it would be counterproductive to request an instruction highlighting [CSAAS] expert testimony supporting the victim's credibility." (*Mateo*, *supra*, 243 Cal.App.4th at p. 1076; see also *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide."].)

## II.

### *CALCRIM No. 226*

Jane admitted she had lied to her parents in the past, about matters her parents considered to be "small" things such as whether she texted a boy or threw out the trash.  The trial court instructed the jury with CALCRIM No. 226, which sets forth the factors for the jury to consider in evaluating witness credibility, as follows:

> "You alone, must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.
>
> "You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe.
>
> "In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:
>
> - How well could the witness see, hear, or otherwise perceive the things about which the witness testified?
> - How well was the witness able to remember and describe what happened?
> - What was the witness's behavior while testifying?

- Did the witness understand the questions and answer them directly?

- Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

- What was the witness's attitude about the case or about testifying?

- Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

- How reasonable is the testimony when you consider all the other evidence in the case?

- Did other evidence prove or disprove any fact about which the witness testified?

- What is the witness's character for truthfulness?

- Has the witness engaged in other conduct that reflects on his or her believability?

"Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.

"If the evidence establishes that a witness's character for truthfulness has not been discussed among the people who know him or her, you may conclude from the lack of discussion that the witness's character for truthfulness is good.

"If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject.

"If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

Sengphachanh did not object or request any addition to the instruction.

On appeal, he contends the trial court erred in failing to sua sponte include

41

an optional factor that would have further told the jury to consider: "Did the witness admit to being untruthful?" (CALCRIM No. 226.) Sengphachanh argues the omission of the factor prejudiced him and mandates reversal because "no other instruction highlighted for the jury the importance of past lies to the assessment of witness credibility." We reject this argument, and conclude the court did not err in omitting the additional factor and, even if we presumed error, it was harmless under the circumstances of this case.

A.  *Additional Background*

Defense counsel cross-examined Jane on her late disclosure of the sexual assault. On redirect, Jane explained the kind of lie she had previously told her parents included telling them she would "stay in the neighborhood" when she did not. She has never lied about Sengphachanh and would never lie "about something like this happening to [her.]"

Grace testified it was "possible" that she did not initially "put a lot of weight into" what Jane told her had happened because Jane had "lied to [her] about certain things" in the past. On redirect, Grace explained Jane has never "made an accusation of this magnitude to [her] before." Rather, Jane had lied to her about "small" things, like throwing out the trash or whether she texted a boy. Earl also testified Jane has never lied "about something of this magnitude before"; she has lied about texting with friends or going out.

The trial court instructed the jury with CALCRIM No. 226, as previously noted. In closing arguments, both the prosecutor and defense counsel addressed Jane's admission of previously lying to her parents. The prosecutor argued:

> "Again, when [Jane] was asked about times that she has lied to her parents, she didn't sit up here and tell you 'I'm a perfect angel; I never lie.' She was honest about things she lied about to her parents. This is teenage stuff. Whether she is done with her homework; is she texting with friends; did she go out and see

42

friends. That is corroborated by what her parents -- even the defense witnesses have to say about what they know about her. [¶] So the inquiry is not just how she lied before, and therefore, if so, we don't believe anything she has to say. Of course not. [¶] Think about what she has gone through since disclosing. There is no immediate gain. There is no getting out of any kind of immediate trouble. Really think about what it takes for her to come in here. What she went through when she disclosed to her parents; going to a forensic interview; having to testify in court; being subject to cross-examination for hours to the point that she is nauseous and gagging on the stand. Does she have a motive to make this up for all of that? No."

"[Her parents] repeatedly questioned her over and over. What did they see? Her behavior was unlike anything that they had ever experienced before. She is shaking. She is sobbing. They were honest with you. They have seen their daughter lie to them before. They're parents. She is 14. That is not what this is. Her disclosure is not that."

In his closing argument, defense counsel urged the jury to conclude that Jane lied about the sexual assault and argued the various factors included in CALCRIM No. 226 supported that conclusion. (See fn. 11, *ante*.) Defense counsel argued Jane lied about being on her period, about the reason she looked up a video on YouTube on "how to tell my parents that I got raped," and about Sengphachanh touching her breast, among other things. Specifically, defense counsel argued to the jury, "The reason that you should doubt her credibility is because she lied."

B.    *Analysis*

An instruction on the credibility of witnesses must be given sua sponte— "*at least in part*"—by the court in every criminal case. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883 (*Rincon-Pineda*), italics added.) CALCRIM No. 226 sets forth factors for the jury to consider in evaluating witness credibility, and it provides additional, optional factors in bracketed language which may be included in the instruction. Relying on *Rincon-*

43

*Pineda* and the bench note to CALCRIM No. 226, Sengphachanh asserts the trial court had a sua sponte duty to instruct on *all* bracketed factors that are relevant based on the evidence. The Attorney General responds that while a trial court has a sua sponte duty to instruct on general principles of witness credibility, that duty does not necessarily require a court to instruct on every applicable bracketed factor in the absence of a request. We agree with the Attorney General.

In *Rincon-Pineda,* the California Supreme Court revisited "legal principles of long standing legitimacy" that required a trial court to instruct in a forcible rape case that " 'the law requires [the jury to] examine the testimony of the female person named in the information with caution.' " (*Rincon-Pineda, supra,* 14 Cal.3d at pp. 866, 870–871 [referring to CALJIC No. 10.22].) Reversing it prior decisions, the Court held the cautionary instruction was no longer to be used and stated: "We deem it appropriate instead to reaffirm and reinforce the existing instructions as to the credibility of witnesses which must presently be given -- *at least in part* (see Pen. Code, § 1127) -- *sua sponte* by the trial court in every criminal case." (*Id.* at p. 883, first italics added.) The Court further explained that "the substance of the instruction set forth as CALJIC No. 2.20 should henceforth always be given, and while those paragraphs thereof inapplicable under the evidence may be omitted, the paragraphs alerting the jury to the bearing on the credibility of a witness of the 'existence or nonexistence of a bias, interest, or other motive' and the attitude of the witness 'toward the action in which he testifies or toward the giving of testimony,' should be given in any case in which the victim of the alleged offense has testified for the prosecution, regardless of whether specific evidence of any motive or disposition to misstate facts on the part of the complaining witness has been adduced by the defendant." (*Id.* at

44

pp. 883–884, footnote omitted.) Thus, *Rincon-Pineda* holds that a trial court must instruct on the credibility of witnesses in every criminal case, but it does not state there is a duty, absent a request, to instruct on any bracketed factor other than a witness's bias or attitude. *Rincon-Pineda* does not extend as far as Sengphachanh urges.

Sengphachanh also relies on the bench note to CALCRIM No. 226, which states that a trial court is to "[g]ive all of the bracketed factors that are relevant based on the evidence." Like *Rincon-Pineda*, the bench note is not clear there is a sua sponte duty to do so. Suggesting the contrary, the bench note states "[t]here is no sua sponte duty to instruct on inconsistencies in testimony *or a witness who lies*"—both of which are optional bracketed factors in CALCRIM No. 226. (Judicial Council of Cal. Crim. Jury Instns. (2014) Bench Note to CALCRIM No. 226, p. 58, italics added.) And although the court in *People v. Martinez* (1978) 82 Cal.App.3d 1, also cited by Sengphachanh, held it was harmless error for the trial court to have omitted from the standard instruction the factor relating to a witness's admission of untruthfulness, the case is unhelpful to us because it does not indicate whether the defense requested the omitted factor, nor does it hold that the court had a sua sponte duty to include the omitted factor. (*Id*. at pp. 19–20; see *People v. Andrews* (1989) 49 Cal.3d 200, 218 ["Generally, [however,] a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."].)

"It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction. [Citations.] '[T]he fact that the necessary elements of a jury charge are to be

45

found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.' [Citation.] 'The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.' " (*People v. Burgener* (1986) 41 Cal.3d 505, 538–539 (*Burgener*), disapproved of on other grounds, *People v. Reyes* (1998) 19 Cal.4th 743, 755–756; accord *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248; *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (quoting *Burgener*, at p. 538.) "There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error. The failure to give an instruction on an essential issue, or the giving of erroneous instructions, may be cured if the essential material is covered by other correct instructions properly given." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277 (*Dieguez*).) We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Here, the trial court instructed the jury that: "In evaluating a witness's testimony, you may consider *anything* that reasonably tends to prove or disprove the truth or accuracy of that testimony." (Italics added.) Among the factors enumerated in the given instruction, the jury was told they may consider the witness's "character for truthfulness," if any, in evaluating her credibility. Moreover, the jury was instructed that: "If you decide that *a witness deliberately lied* about something significant in this case, you should consider not believing anything that witness says. Or, if you think *the witness lied about some things*, but told the truth about others, you may simply accept the part that you think is true and ignore the rest." (Italics added.) Thus, contrary to Sengphachanh's contention that "no . . . instruction

46

highlighted for the jury the importance of past lies to the assessment of witness credibility," the jury was properly instructed that they were free to draw whatever conclusion they wished from Jane's testimony, and they were instructed to consider and were given guidance as to how to consider Jane's admission of prior untruthfulness. Thus, the court did not err in omitting the additional optional factor essentially reiterating that the jury may consider whether the witness admitted to being untruthful. Viewing CALCRIM No. 226 in its entirety, we are satisfied the trial court adequately instructed the jury on the relevant legal principles regarding witness credibility. (*Burgener*, *supra*, 41 Cal.3d at pp. 538–539; *Dieguez*, *supra*, 89 Cal.App.4th at p. 277.)

Even if we were to presume the trial court erred in omitting the additional optional factor, we would conclude the error was harmless. Any improper omission of jury instructions is evaluated under the standard set forth in *Watson*, *supra*, 46 Cal.2d at p. 836. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 830.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)

As we have already noted, the jury was properly instructed that in evaluating a witness's credibility they could consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including specifically a witness's prior untruthfulness. Both attorneys' arguments also focused the jury on Jane's prior untruthfulness in

47

evaluating her credibility. But, as the prosecutor pointed out, the things Jane admitted being untruthful about were relatively minor "teenage stuff." And while defense counsel *argued* that Jane had lied about matters significant to the case, such as Sengphachanh previously touching her breast, Jane did not *admit* that she was untruthful about anything concerning Sengphachanh or the allegations at issue in the case.

Moreover, as we have previously concluded, the prosecution's case against Sengphachanh was strong. Sengphachanh makes the same argument that the jury's inability to reach a verdict on count 1 is evidence that "nine of the jurors did not believe [Jane's] story that she had been raped" and thus had the jurors been instructed to take account of her past lies, it was reasonably probable they would have reached a different outcome. For the reasons we have already discussed, we reject this interpretation of the jury's failure to reach a verdict on count 1. Given the combination of the whole instruction given, the attorneys' arguments to the jury, and the strength of the prosecution's evidence against Sengphachanh, we conclude it is not reasonably probable Sengphachanh would have achieved a more favorable result had the trial court included in its CALCRIM No. 226 instruction the additional bracketed factor.

## III.

### *Cumulative Error*

Sengphachanh asserts the cumulative effect of the claimed instructional errors deprived him of a fair trial and requires reversal. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) As we have explained, to the extent the trial court's failure to give either instruction was error, that error was harmless. For the

reasons already discussed, we further conclude that the cumulative effect of any individual instructional errors was harmless. (*People v. Chism* (2014) 58 Cal.4th 1266, 1309 ["To the extent there are instances in which we have found error or assumed its existence, we have concluded no prejudice resulted. We do not find reversible error by considering the claims cumulatively."]; see *People v. Hinton* (2006) 37 Cal.4th 839, 872 [no cumulative error where "the errors are relatively few and . . . the prejudicial effect was in each instance minimal to nonexistent"].) We therefore reject Sengphachanh's claim that his trial was fundamentally unfair. (*People v. Rivera* (2019) 7 Cal.5th 306, 348; *People v. Stewart* (2004) 33 Cal.4th 425, 522.)

IV.

*Evidence of Prior Uncharged Sexual Offense*
*Pursuant to Evidence Code section 1108*

In a motion in limine, the prosecution sought to admit testimony from Jane that, on a prior occasion, Sengphachanh "touch[ed] her breasts as he cuddled her on the couch," pursuant to Evidence Code section 1108 (the 1108 evidence).[14] Defense counsel objected to introduction of the 1108 evidence on the basis that Jane disclosed the incident late, apparently on "the eve of trial." The trial court overruled the defense objection and granted the

_____

14    Evidence Code section 1108, subdivision (a), provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

49

prosecution's motion, stating Jane's late disclosure was "fodder for full cross-examination."[15]

However, despite the ruling in its favor, the prosecution did not introduce the 1108 evidence in its direct examination of Jane, or at any other time. As previously discussed, it was defense counsel who elicited testimony about the uncharged sexual offense from Jane in order to impeach her. (See Factual and Procedural Background, Section I.B.1, *ante.*) On appeal, Sengphachanh does not contend his trial counsel rendered ineffective assistance of counsel by affirmatively introducing the 1108 evidence to impeach Jane. Rather, he contends his trial counsel was ineffective when he failed to object under Evidence Code section 352 to the prosecution's motion to admit the 1108 evidence in the first instance. We are not persuaded.

As we have discussed, " '[i]n order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing profession norms. [(*Strickland*, *supra*, 466 U.S. at pp. 687–688.)] Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Majors* (1998) 18 Cal.4th 385, 403 (*Majors*).) Moreover, "[w]here 'there was no sound legal basis for objection, counsel's failure to object to the admission

_____

15    The Attorney General is incorrect that the court "tentatively ruled it would admit the evidence"; rather, the court "granted" the prosecution's motion.

of evidence cannot establish ineffective assistance.' [Citation.] And, *even when there was a basis for objection, ' "[w]hether to object to admissible evidence is a tactical decision*; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." [Citation.] "In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of rational tactical purpose for the challenged act or omission." ' " (*Ibid*., italics added.) And where the record is silent as to counsel's motivation, the reviewing court must reject an ineffective assistance of counsel claim "unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*Scott*, *supra*, 15 Cal.4th at p. 1212.)

Here, Sengphachanh argues trial counsel's failure to object to the 1108 evidence under Evidence Code section 352 "is unexplainable as a reasonable tactical decision." He asserts trial counsel "was obviously concerned about introduction of this evidence" because he objected "strenuously" to its admission. The record does not support Sengphachanh's contentions. Defense counsel did not "strenuously" object to introduction of the 1108 evidence, and then affirmatively introduced the evidence to impeach Jane. This was the entire colloquy between the court and defense counsel regarding the defense's objection to the prosecution's motion:

> Court: "Here, the People's offer of proof is that the defendant touched [Jane's] breast area when they cuddled together on the couch before the alleged incident in the current Information. [¶] So the defense objected that this disclosure came out just last Friday; so there was late notice of this. And that she made no mention of it during the prelim. The preliminary examination was extensive, and she made no mention of being touched in the chest beforehand. [¶] The [c]ourt's tentative is to allow this,

51

understanding that failing to disclose it at the prelim, or previously, is fodder for full cross-examination. [¶] Any additional objections for the record, [defense counsel]?"

Defense: "No, Your honor."

Court: "So that motion is granted under [Evidence Code] 1108."

Sengphachanh's sole defense against the charges of child sexual abuse was that Jane lied. Defense counsel's strategy in cross-examining Jane was to undermine her credibility by impeaching her with prior inconsistent statements and late disclosures. Consistent with that strategy, defense counsel sought to portray Jane's late disclosure of the breast touching incident as yet another example of fabrication. Sengphachanh attempts to explain that trial counsel "likely introduced the evidence because, and only because, he was left with no choice" because "there was a clear threat" the prosecution would rely on the evidence. This is pure speculation. The prosecution conducted an extensive direct examination of Jane and did not attempt to elicit testimony from her regarding the prior incident. Thus, even if there was a basis for trial counsel to object to the 1108 evidence under Evidence Code section 352, Sengphachanh has failed to show that the record "affirmatively" discloses a lack of rational tactical purpose for counsel to not object on that ground. (*Majors, supra*, 18 Cal.4th at p. 403.) On that basis alone, we reject the claim of ineffective assistance of counsel. (*Ibid.*; *Scott, supra*, 15 Cal.4th at p. 1212.)

Sengphachanh has also failed to demonstrate prejudice. He asserts "there is a likelihood that the trial court would have – if asked – excluded the evidence under Evidence Code section 352." We cannot agree. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt

52

is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 639.) The breast touching incident is minor in comparison to the charged offenses, which included aggravated assault of a child by rape, such that there is little risk of it evoking an emotional bias against the defendant. Even Sengphachanh acknowledges "the alleged prior touching was of *such little consequence* to [Jane] that she did not even remember it until right before trial." Sengphachanh argues again the jury's impasse in his favor on count 1 demonstrates it "did not believe that [Sengphachanh] penetrated [Jane]" and "reflected it had serious doubts about [Jane's] credibility." We have already disposed of this argument. Moreover, here, the jury's failure to reach a verdict on count 1 demonstrates that it diligently weighed the evidence, applied the law, and gave Sengphachanh the benefit of reasonable doubt and held the prosecution to its burden of proof, rather than be persuaded by any emotional bias as a result of the 1108 evidence.

In sum, we conclude Sengphachanh has failed to demonstrate trial counsel rendered ineffective assistance by failing to object to the 1108 evidence on Evidence Code section 352 grounds.

V.

*Sentencing*

Sengphachanh originally asserted he was entitled to remand for resentencing for two reasons. First, the trial court prejudicially erred when it denied his request to be physically present at his sentencing hearing based

53

on public health and safety issues posed by the ongoing COVID-19 pandemic. The Attorney General concedes this was error but argues it was harmless. We accept the Attorney General's proper concession and conclude the error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 23 (*Chapman*) or *Watson, supra*, 46 Cal.2d at page 836.

Second, Sengphachanh asserts the trial court erred by imposing fines and fees without determining his ability to pay pursuant to *Dueñas, supra*, 30 Cal.App.5th 1157 and he is entitled to remand for an ability to pay hearing. We reject this contention. However, due to a change in the law while this appeal was pending, the Attorney General concedes, and we agree, Sengphachanh is entitled to have any unpaid portion of the $154 criminal justice administration fee as of July 1, 2021 vacated.

In his petition for rehearing, Sengphachanh asserts a third reason for remand on sentencing. He asserts he is entitled to retroactive application of the recent amendments to section 1170, subdivision (b), which limit the situations in which the trial court may impose an upper term. The Attorney General concedes the amendments are retroactive under *In re Estrada* (1965) 63 Cal.2d 740, 744−745 (*Estrada*) and remand is appropriate. Accepting the concession as proper, we will remand the matter to the trial court for resentencing consistent with section 1170, subdivision (b), as amended.

A.    *Additional Background*

On June 12, 2020, due to the ongoing COVID-19 global pandemic and its effects on court services, the trial court conducted a telephonic hearing on a matter which is not at issue in this appeal. Sengphachanh waived his personal appearance for the proceeding pursuant to section 977, subdivision (b)(1) and defense counsel appeared on his behalf. During the proceeding, defense counsel informed the court that Sengphachanh wished to be

54

"physically present" in the courtroom for all future hearings and he did not waive his presence for those hearings.

The trial court denied Sengphachanh's request and set the matter for sentencing on July 10, 2020. It ruled his participation "visually" from jail by videoconference would be "sufficient," in particular because he would have counsel on a separate, confidential telephone line to discuss any matters with his attorney during the proceeding. The court further explained that it based its ruling on the "public health and safety issues due to the COVID-19 pandemic," and noted the court was closed "for all but the most time sensitive essential functions from March 17 through May 22" and strict health orders were still in effect. These included orders requiring people to shelter in place; prohibiting gatherings of more than one person except for specific exceptions; requiring closure of schools; and mandating that all persons entering the courthouse submit to a temperature check, wear masks, and observe a 6-foot social distancing rule.

The sentencing hearing was conducted remotely by videoconference on July 10, 2020. Only the trial judge and essential court staff were present in the courtroom. All others, including Sengphachanh, Jane and her family, and the attorneys, appeared by videoconference. Before proceeding to sentencing, Sengphachanh raised a *Marsden*[16] motion to relieve his court-appointed attorney; the motion is not at issue in this appeal. The court made "the necessary technical arrangements" to close the proceedings to provide Sengphachanh a "closed, confidential hearing" to address his *Marsden* motion. The court denied the motion and resumed the video hearing for sentencing with all parties and attorneys present.

---

16    *People v. Marsden* (1970) 2 Cal.3d 118.

In advance of sentencing, on November 15, 2019, Sengphachanh filed a "Sentencing Memorandum and Statement in Mitigation" with five letters from family and friends requesting a lenient sentence and various photographs of Sengphachanh and his family. The court read and considered Sengphachanh's submissions before imposing sentence, and had also received the prosecution's statement in aggravation and the probation report. The prosecution had also given the defense prior notice that Jane and her family would be presenting victim impact statements, and defense counsel confirmed she had received a copy of a letter Jane sent to the court on March 3.

In his sentencing memorandum, Sengphachanh requested the court impose the low term of three years state prison, and asserted eight factors in mitigation: He was 36 years old with no criminal history; had honorably served in the Navy for 18 years; had the respect of his peers and friends; has the love and support of his wife; is the proud father of two small children; has been a productive citizen and supported his family; is not substance dependent and is a good candidate for rehabilitation; and is not a threat to the community and will comply with his parole terms. He further asserted he does not pose a risk to the public or to the victim. Defense counsel reiterated these factors in mitigation and requested the court impose the low term at the sentencing hearing, and stated she "would also like to be heard later as to restitution."

The prosecution then informed the trial court that Jane and her family were prepared to join the video hearing to give their impact statements. At that moment, Sengphachanh spoke up and stated: "Well, as of right now, I would like to be sentenced -- I'd like to be present to be sentenced." The court denied the request, again due to the COVID-19 pandemic and concerns with

56

safely moving prisoners from jail to the courthouse. It found the "video sentencing [wa]s fulfilling all the same needs of confrontation."

Jane and her parents gave their impact statements. Both Earl and Grace stated they had forgiven Sengphachanh and wished him well. The prosecutor requested the court impose the upper term of eight years in state prison, arguing, among other factors, "the act itself [wa]s horrifying, one of the worst things imaginable that one could do to a child let alone anyone."

The trial court confirmed Sengphachanh was statutorily ineligible for probation due to the jury's true finding that he had "substantial sexual conduct" with Jane pursuant to section 1203.66, subdivision (a)(8). It stated, however, that even if Sengphachanh was eligible for probation, it would deny probation because he committed the crime with criminal sophistication, having waited until Jane was asleep and placing a blanket over her head to commit the sexual assault. As to count 2, lewd act upon a child, the court sentenced Sengphachanh to the upper term of eight years in state prison. The court selected the upper term because it found Sengphachanh took advantage of a position of trust and confidence to commit the offense.

As for fines and fees, the trial court ordered Sengphachanh to pay a $2,400 restitution fine (§ 1202.4, subd. (b)) and a parole revocation restitution fine of $2,400 (§ 1202.45). Before concluding its orders, defense counsel interrupted the trial court and requested she be heard "as to restitution." The court responded, "Okay. We'll get to *victim* restitution in a moment. These are the fines." (Italics added.) Defense counsel then stated she was also asking the court to "consider suspending or staying restitution fines based on the fact of [Sengphachanh's] inability to pay." She argued the fines "would be very overwhelming" because Sengphachanh "will be going to state prison" and the court will order some victim restitution. The court responded

that it would continue imposing the fines and then it will address "that issue." The court imposed a $30 court security fee (§ 1465.8); a $40 criminal conviction assessment fee (Gov. Code, § 70373); a $154 criminal justice administration fee (Gov. Code, § 29550.1); and a $300 sex registration fee (§ 290.3). Based on the Victim Compensation Board's request and Sengphachanh's agreement, the court ordered Sengphachanh to pay a total of $3,590.13 in victim restitution (§ 1202.4, subd. (f)). At the conclusion, the court asked the attorneys, "Is there anything else?" Defense counsel responded, "I don't believe so, Your Honor."

B.  *Denial of Sengphachanh's Physical Presence at Sentencing Was Harmless Error*

A felony defendant's right to be present at every critical stage of a criminal proceeding, including at the time of sentencing, is guaranteed by the federal Constitution under the confrontation clause of the Sixth Amendment and the due process clauses of the Fifth and Fourteenth Amendments, as well as article I, section 15 of the California Constitution and sections 977 and 1043. (*People v. Mendoza* (2016) 62 Cal.4th 856, 898 (*Mendoza*); *People v. Blacksher* (2011) 52 Cal.4th 769, 798–799 (*Blacksher*); *People v. Robertson* (1989) 48 Cal.3d 18, 60 (*Robertson*)). Like other constitutional rights, the right to be present may be waived but it must be a voluntary, knowing and intelligent waiver. (*Mendoza*, at pp. 898–899; see §§ 977, subd. (b)(1) and 1193, subd. (a).)[17]

---

[17]  Section 977, subdivision (b)(1), provides that a felony defendant "shall be personally present . . . at the time of the imposition of sentence" and "shall be personally present at all other proceedings unless [he or she] shall, with leave of court, execute in open court, a written waiver of [his or her] right to be personally present."

At the time of Sengphachanh's sentencing hearing, Governor Newsom and Chief Justice Cantil-Sakauye had issued a series of orders in response to the COVID-19 pandemic to ensure court operations occurred in a safe environment for the public, court users, judicial officers and court personnel. (See *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, 167.) On April 6, 2020, acting on the authority granted by the Governor, the Judicial Council adopted 11 emergency rules. (See *E.P. v. Superior Court* (2020) 59 Cal.App.5th 52, 55 (*E.P.*).) Emergency Rule 3(a)(1), addressed the use of technology for remote appearances and provided that "in order to protect the health and safety of the public, including court users, both in custody and out of custody defendants, witnesses, court personnel, judicial officers, and others," courts "may require that criminal proceedings and court operations be conducted remotely." However, "[i]n criminal proceedings, *courts must receive the consent of the defendant to conduct the proceeding remotely* and otherwise comply with emergency rule 5. . . . As used in this rule, 'consent of the defendant' means that the consent of the defendant is required only for the waiver of the defendant's appearance as provided in emergency rule 5." (Emergency Rule 3(a)(2), italics added.) Emergency Rule 5 provides that "*[w]ith the consent of the defendant*, the court must allow a defendant to

---

Section 1193, subdivision (a), provides, in relevant part, that a defendant convicted of a felony "shall be personally present when judgment is pronounced against him or her, unless the defendant, in open court and on the record, or in a notarized writing, requests that judgment be pronounced against him or her in his or her absence, and that he or she be represented by an attorney when judgment is pronounced, and the court approves his or her absence during the pronouncement of judgment, or unless, after the exercise of reasonable diligence to procure the presence of the defendant, the court shall find that it will be in the interest of justice that judgment be pronounced in his or her absence."

59

waive his or her personal appearance and to appear remotely, either through video or telephonic appearance, when the technology is available" or waive his or appearance and permit counsel to appear on the defendant's behalf under certain circumstances. (Emergency Rule 5(b)(1) and (2), italics added.)

Sengphachanh's constitutional and statutory right to be present at his sentencing is not in dispute. The Attorney General concedes the trial court erred when it denied Sengphachanh's request to be physically present at his sentencing and conducted his sentencing remotely without his consent. The question then is whether the error prejudiced Sengphachanh. Our high court has "reaffirm[ed] that review of any error under sections 977 and 1043 is conducted under the *Watson* standard [(*Watson*, *supra*, 46 Cal.2d at p. 836)]—asking whether it is 'reasonably probable a result more favorable to the defendant would have been reached in the absence of the error.' " (*Mendoza*, *supra*, 62 Cal.4th at p. 902.) " 'Under the federal Constitution, error pertaining to a defendant's presence is evaluated under the harmless-beyond-a-reasonable-doubt standard set forth in [*Chapman*, *supra*, 386 U.S. at p. 23].' " (*Mendoza*, at p. 902.) And it is " '[Sengphachanh who] has the burden of demonstrating that his [physical] absence prejudiced his case[.]' " (*Blacksher*, *supra*, 52 Cal.4th at p. 799.)

Here, Sengphachanh's asserts the prosecution's request for the upper term was "premised" on "alleged facts that were not supported in light of the not guilty verdict on count 1 which reflected a determination that the prosecution had not adequately proven [he] raped [Jane.]" He asserts that "[h]ad [he] been physically present at the [sentencing], he may have been able to more quickly react and assist his counsel in rebutting the prosecution's argument, and in arguing against imposition of the upper term." Not so. First, the jury did not acquit him of the aggravated sexual assault in count 1,

60

and as we have already discussed, the jury's failure to reach a unanimous verdict on that count can be explained by its reasonable conclusion that the prosecution failed to prove beyond a reasonable doubt the existence of force, violence, duress, menace or fear of immediate and unlawful bodily injury. The record also demonstrates Sengphachanh was able to fully present his arguments in support of requesting the low term before the court imposed sentence.

*Robertson* is instructive here. There, a jury found defendant guilty of two first degree murders, found true nine charged special circumstances, and fixed the penalty at death. (*Robertson*, *supra*, 48 Cal.3d at p. 28.) After the court announced its decision that the penalty should be death, defendant made a statement in which he took responsibility and expressed remorse. The court then set the matter for a penalty-reduction hearing and sentencing. Through his attorney, defendant informed the court he wished to waive his presence at the penalty-reduction hearing and subsequently executed a written waiver. The waiver specifically referred to the penalty-reduction hearing but was silent as to imposition of sentence. The defendant did not appear at the penalty-reduction hearing and sentencing, and the court formally imposed the judgment of death. (*Id.* at pp. 59–60.) The defendant argued his absence at sentencing deprived him of the opportunity to address the court before pronouncement of final judgment. (*Id.* at p. 62.) The Court concluded defendant's waiver was not a knowing and intelligent waiver of his presence at the time of sentence. However, it held the error was harmless beyond a reasonable doubt under the *Chapman* standard because defendant

61

had made a statement to the court following its sentence verdict and before pronouncement of judgment.[18] (*Id.* at pp. 61–62.)

Here, as in *Robertson*, the court considered all of Sengphachanh's written submissions, including his sentencing memorandum and statement in mitigation, letters and information from family and friends, and defense counsel was permitted to present additional oral arguments *before* the court imposed sentence.

In his reply brief, Sengphachanh adds to his assertion of prejudice that "[n]othing is known about if the video feed was working correctly, how well appellant could see the court, how well the court could see appellant and observe his demeanor, and if there was any delay caused by having to communicate with his counsel only by phone." He argues "[w]e do not know if the camera could accurately convey to the court the full scope of [his] demeanor, the assessment of which may have influenced the court's choice of the upper term." We see nothing in the record to support Sengphachanh's conjecture of technical problems with the video connection. At no time did the trial judge, the lawyers, Sengphachanh, or any participant state they could not see or hear a speaker, and Sengphachanh provides no record citation to show otherwise. Contrary to Sengphachanh's suggestion he may

---

[18]    *E.P.*, on which Sengphachanh relies, does not persuade us to reach a different result as it is inapposite. There, the court granted the minor's petition for writ of mandate challenging the juvenile court's *blanket and ongoing* local rule, issued in response to the COVID-19 pandemic, that required all minors to show good cause in order to personally appear *at all* proceedings in juvenile court. (*E.P.*, *supra*, 59 Cal.App.5th at pp. 54, 56.) The court's primary concern in granting mandamus relief was that "absent [the] court's intervention, petitioner and other minors in pending delinquency proceedings will continue to be barred from being physically present at juvenile court hearings absent a good cause finding." (*Id.* at p. 61.)

have had difficulty in speaking confidentially with his attorney, he successfully conferred with his attorney off the record, via the separate confidential telephone line, about whether he would stipulate to the amount of victim restitution. The court also successfully made "the necessary technical arrangements" to conduct a "closed, confidential hearing" on his *Marsden* motion. Sengphachanh also showed he was able to react in real time to the proceedings when he addressed the court several times. For example, Sengphachanh interjected when the prosecutor announced that Jane and her family will be giving their impact statements to inform the court that "as of right now" he wanted to be present at sentencing. Finally, the court imposed the upper term because it found Sengphachanh took advantage of a position of trust and confidence to commit the offense, not because of Sengphachanh's demeanor or lack of remorse.

In sum, Sengphachanh was able to meaningfully participate at his sentencing, even virtually. Under these circumstances, we conclude Sengphachanh has failed to demonstrate he was prejudiced by his virtual participation at sentencing, under either *Chapman* or *Watson*.

C.   *Any Unpaid Portion of the $154 Criminal Justice Administration Fee Shall Be Vacated*

After Sengphachanh was sentenced and while his appeal was pending, Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill No. 1869) was signed into law. As of July 1, 2021, pursuant to Assembly Bill No. 1869, the statutory provision pursuant to which the court ordered Sengphachanh to pay a $154 criminal justice administration fee (former section 29550.1 of the Government Code) was repealed, and Government Code section 6111 was added. (Assem. Bill No. 1869, §§ 11, 24.) Government Code section 6111, subdivision (a), provides that: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of

63

Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." The Attorney General concedes, and we agree, Sengphachanh is entitled to vacatur of any unpaid balance of his criminal justice administration fee as of July 1, 2021.

D. *Trial Court Did Not Err in Imposing the Balance of the Fines and Fees, and Any Error Is Harmless*

Relying on *Dueñas*, Sengphachanh asserts the trial court erred by imposing a $2400 restitution fine pursuant to section 1202.4, subdivision (b), as well a $30 court security fee (§ 1465.8) and a $40 criminal conviction assessment fee (Gov. Code, § 70373), without first determining his ability to pay. He asserts he is entitled to remand for an ability to pay hearing. We disagree.

In *Dueñas*, the Court of Appeal held that due process requires the trial court to hold an ability to pay hearing before imposing fines, fees, or assessments and that the burden to prove ability to pay is on the prosecution. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1164, 1172.) The court further held that execution of any restitution fine imposed under section 1202.4, subdivision (b), must be stayed "until and unless" the trial court holds an ability to pay hearing and the People demonstrate the defendant has the ability to pay the restitution fine. (*Id.* at p. 1172.) Sengphachanh urges us to follow *Dueñas*. But "[o]ther courts, including this court, have disagreed with *Dueñas* on these key principles." (*People v. Keene* (2019) 43 Cal.App.5th 861, 863; see, e.g., *People v. Cota* (2020) 45 Cal.App.5th 786, 795; *People v. Allen* (2019) 41 Cal.App.5th 312, 326 ["[W]e would adopt the reasoning of the numerous courts that have rejected *Dueñas*'s due process analysis."]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, 93–98 (*Kopp*), review

granted Nov. 13, 2019, S257844.) Our Supreme Court is currently considering the viability of *Dueñas* as it pertains to whether a trial court must consider a criminal defendant's ability to pay assessed fines and fees, and if so, which party bears the burden of proof. (*Kopp*, *supra*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

We need not delve into the broader issues of *Dueñas*, though, to address the issue before us in this case. Here, the trial court imposed a restitution fine of $2400 and, even before *Dueñas*, section 1202.4 expressly permitted challenges to the imposition of a restitution fine in excess of the statutory minimum of $300. (§ 1202.4, subds. (b)(1), (d); *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Section 1202.4, subdivision (d) provides, in relevant part: "In setting the amount of the fine pursuant to subdivision (b) *in excess of the minimum fine* pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay." (Italics added.) The statute also makes clear that *"[a] defendant shall bear the burden of demonstrating [his or her] inability to pay."* (§ 1202.4, subd. (d), italics added.) In cases since *Dueñas*, courts have clarified "it is [the defendant's] burden to make a record below as to their ability to pay these [fines, fees, and] assessments." (*Kopp*, *supra*, 38 Cal.App.5th at p. 96; *People v. Santos* (2019) 38 Cal.App.5th 923, 934 ["it is the defendant's burden to demonstrate an inability to pay, not the prosecution's burden to show the defendant *can* pay, as the *Dueñas* decision might be read to suggest"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 ["Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed."].)

65

Here, defense counsel initially raised the issue of the Sengphachanh's ability to pay and asked the court to "consider suspending or staying restitution fines based on the fact of [Sengphachanh's] inability to pay." The only issues that defense counsel raised were that Sengphachanh was going to prison and the court was also going to order some victim restitution. The trial court indicated it would address the issue after it finished imposing all fines and fees. The court then ordered victim restitution of $3,590.13, an amount Sengphachanh agreed to, and imposed various common fines and fees of a lesser amount. Although the trial court had not directly addressed the issue of Sengphachanh's ability to pay, defense counsel was given the opportunity but did not raise the issue again and did not present any further evidence or argument.

As an initial matter, the trial court was not required to make an express finding regarding Sengphachanh's ability to pay. (§ 1202.4, subd. (d).) The court was, however, required to *consider* the defendant's ability to pay the restitution fine (§ 1202.4, subd. (c)), and there is at least some ambiguity in the record before us as to whether and to what extent the trial court did so here. Regardless, any error arising from the court's failure to conduct an ability to pay hearing, or to adequately consider the issue, is harmless because the record demonstrates Sengphachanh cannot make the requisite showing that he is unable to pay the fines and fees imposed. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; see also *People v. Cervantes* (2020) 46 Cal.App.5th 213, 229 ["the error would be harmless because the record demonstrates, beyond a reasonable doubt, that [the defendant] will be able to pay the total amount imposed"].)

Sengphachanh was 36 years old at the time of sentencing. He has a high school degree and had served in the United States Navy since 2001,

working as a diesel mechanic. He was sentenced to prison for eight years and indicated he would be discharged from the Navy as a result of his conviction, but his skills as a mechanic are transferable and there is nothing in the record to suggest he cannot earn wages both in prison and upon his release. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 [court may consider defendant's ability to pay in the future, including "defendant's ability to obtain prison wages and to earn money after his release from custody"]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison].) Further, at the time of sentencing, he owned a home in San Diego and his wife was also gainfully employed. Moreover, Sengphachanh agreed to the amount of $3,590.13 for victim restitution, indicating he had the ability to pay that amount, and the total amount of the other fines and fees imposed is less than $3,000. There are no facts presented in the record or on appeal that would allow us or the trial court to conclude Sengphachanh does not also have the ability to pay the additional $3,000.

We, therefore, conclude the trial court did not err in imposing the fines and fees, and, even if error, we conclude it was harmless.

E.     *The Matter Shall Be Remanded for Resentencing Pursuant to Section 1170, Subdivision (b), as Amended*

At the time of Sengphachanh's sentencing, section 1170, former subdivision (b), left it to the sentencing court's "sound discretion" to select the appropriate term within a sentencing triad that "best serves the interests of justice." (§ 1170, former subd. (b), as amended by Stats. 2018, ch. 1001 (Assem. Bill No. 2942) § 1.) Here, the trial court sentenced Sengphachanh to the upper term of 8 years on count 2, lewd act upon a child, and explained it

chose the upper term because it found Sengphachanh took advantage of a position of trust and confidence to commit the offense.

While the present appeal was pending, the Legislature enacted Senate Bill 567, which made significant amendments to section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Effective January 1, 2022, a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subds. (b)(1), (b)(2).) Bifurcation of such jury findings are also now required. (*Id.*, subd. (b)(2) ["Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense."].)[19]

Under the *Estrada* rule, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final. (*People v. Frahs* (2020) 9 Cal.5th 618, 626; *People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada,*

---

[19]   Although not relevant to this appeal, subdivision (b)(3) of section 1170 permits a sentencing court to "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." New sentencing rules reflected in subdivision (b)(4) through (b)(7) of section 1170 likewise do not bear on this appeal.

*supra,* 63 Cal.2d 740.) By narrowing the permissible grounds on which a sentencing court can impose an upper term under section 1170, subdivision (b), Senate Bill 567 is ameliorative on some sentences. Because the Legislature gave no indication these amendments should apply prospectively only, under the *Estrada* rule we infer that the Legislature intended the new law to apply retroactively to all nonfinal convictions on appeal. (See *People v. Lopez* (May 10, 2022, D078841) ___ Cal.App.5th ___ [2022 WL 1467716 at p. *7] (*Lopez*) [finding Senate Bill No. 567 retroactive].)

The Attorney General concedes, and we agree, the aggravating factors the trial court relied upon were neither stipulated to nor found true beyond a reasonable doubt by a trier of fact. Accordingly, the sentence imposed does not comply with section 1170, subdivision (b), as amended. We therefore remand the matter to the trial court for resentencing consistent with section 1170, subdivision (b). (See *Lopez, supra,* ___ Cal.App.5th ___ [2022 WL 1467716 at p. *7].)

## DISPOSITION

Any portion of the $154 criminal justice administration fee imposed pursuant to former Government Code section 29550.1 unpaid as of July 1, 2021 is vacated. The matter is remanded to the trial court for resentencing. The judgment is affirmed in all other respects.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

70